UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**ORIGINAL**

---

**JOCELYN ESTRELLA, o/b/o M.R.E.,**

**Plaintiff,**

*- against -*

**NANCY A. BERRYHILL, ACTING COMMISSIONER
OF SOCIAL SECURITY,[1]**

**Defendant.**

---

15 CV 6966 (CS)(LMS)

<u>REPORT AND
RECOMMENDATION</u>

---

**TO: THE HONORABLE CATHY SEIBEL, U.S.D.J.**

Plaintiff Jocelyn Estrella commences this action pursuant to 42 U.S.C. § 405(g). She

seeks judicial review of the final decision of the Commissioner of Social Security (the

"Commissioner"), which denied her application for Supplemental Security Income ("SSI")

benefits. ECF No. 1. Each party has submitted a motion for judgment on the pleadings pursuant

to Rule 12(c) of the Federal Rules of Civil Procedure. ECF Nos. 17, 22. For the reasons

discussed below, I conclude, and respectfully recommend that Your Honor should conclude, that

the Commissioner's motion for judgment on the pleadings (ECF No. 22) be denied, and Plaintiff's

motion (ECF No. 17) be granted. As such, the ALJ's decision should be vacated, and the case

should be remanded to the Agency for further proceedings consistent with this Report and

Recommendation.

---

[1] Ms. Berryhill is the current Acting Commissioner of Social Security, effective January
20, 2017, and is automatically substituted herein as Defendant pursuant to Fed. R. Civ. P. 25(d).

# I.   BACKGROUND

## A.   Procedural History

Plaintiff filed a claim for SSI on behalf of her infant son, M.R.E. (or "the claimant"), on July 24, 2012. AR 178-87.[2]  By correspondence dated August 24, 2012, the Social Security Administration (the "SSA" or "Agency") denied Plaintiff's application. AR 94-99. Plaintiff then requested a hearing before an administrative law judge ("ALJ"). AR 100. The Agency conducted two hearings, which were held on August 21 (AR 69-84) and December 6, 2013 (AR 50-68). On January 15, 2014, the ALJ issued an unfavorable decision. AR 29-49. Plaintiff subsequently filed a request for review of the ALJ's decision with the Appeals Council, which was denied on July 24, 2015. AR 1-7. Accordingly, the ALJ's January, 2014, decision became the final action of the Commissioner.

The instant lawsuit followed. See ECF No. 1. In her papers, Plaintiff argues that the Commissioner's findings are contrary to law and regulations promulgated pursuant to the Social Security Act (the "Act") and not supported by substantial evidence. ECF No. 1. She asks this Court to reverse the Commissioner's decision and award benefits, or in the alternative, to vacate the decision and remand the matter to the Agency for further proceedings. ECF No. 1, at 4.

---

[2] Citations to "AR" refer to the certified copy of the administrative record filed by the Commissioner as part of her answer. See ECF No. 13.

**B.    Medical & Educational Records**

    **1.    Evidence Before the ALJ**

        **a.    Records Pre-dating Plaintiff's SSI Application[3]**

            **i.    Steinway Child and Family Services**

M.R.E. began receiving treatment through Steinway Child and Family Services, Inc. ("Steinway"), a non-profit agency, in February, 2009. AR 377. On March 19, 2009, Lauren McEvoy, a licensed master social worker ("LMSW"), completed an Intake Summary, which recorded M.R.E.'s educational and developmental histories to date. AR 377-80.[4] M.R.E., who was then five years old, had first been referred to Steinway from Elmhurt Hospital's Child and Adolescent Walk-In Clinic, where he was diagnosed with attention deficit/hyperactivity disorder ("ADHD"), combined type, and oppositional defiant disorder ("ODD"). AR 377.[5]

---

[3] Because SSI benefits are not payable for any month prior to the month in which an application is filed, the relevant period at issue in an SSI claim runs from the date of filing through the date of the ALJ's decision. 20 C.F.R. § 416.330. Here, that relevant period began on July 24, 2012. AR 178-87 (filing of the application). A recitation of the evidence prior to that date is nevertheless relevant, as a claimant's complete medical history should be considered when determining his or her disability as of the filing date. See, e.g., Hollaway v. Colvin, No. 14-Civ-5165, 2016 WL 96172, at *2 (S.D.N.Y. Jan. 8, 2016) (citing 20 C.F.R. § 416.912(d)), report and recommendation adopted, 2016 WL 1275658 (S.D.N.Y. Mar. 31, 2016).

[4] LMSW McEvoy reported that, at the time, M.R.E. was a pre-kindergarten student at the Milestone School for Child Development, which he had attended since he was 15 months of age. AR 379-80. Plaintiff began noticing an increase in M.R.E.'s hyperactive and impulsive behavior beginning in September, 2008, when M.R.E. was removed from a small classroom setting. AR 379. An evaluation conducted at Elmhurst Hospital at the time indicated that M.R.E. demonstrated "marked impulsivity, hyperactivity, difficulty focusing, low frustration tolerance, temper tantrums, oppositional and 'out of control' behaviors at school." AR 380.

[5] ADHD includes a combination of persistent symptoms, such as difficulty sustaining attention, hyperactivity, and impulsive behavior. Diseases & Conditions: Attention-deficit/hyperactivity disorder (ADHD) in children, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/adhd/home/ovc-20196177 (last visited May 19, 2017). Additionally, children struggling with ADHD may also experience symptoms of low self-esteem, troubled relationships, and poor performance in school. Id. Children with ODD

Ms. McEvoy's notes with respect to the frequency and intensity of M.R.E.'s symptoms are somewhat equivocal. At times, she noted, M.R.E. demonstrated the ability to follow directions and accept limits. AR 377. On other occasions, he was susceptible to temper tantrums and spells of yelling, "especially when limits [were] set by his mother." AR 377. M.R.E. displayed marked impulsivity, distractability, and low frustration tolerance, but was able "to appropriately take turns and to stick to a game at other times[]." AR 377. She also wrote that M.R.E. appeared to be of average intelligence and was, at times, friendly and easily engaged, while at other times he displayed impulsive and oppositional behavior. AR 377. Ms. McEvoy determined that M.R.E. was in need of therapy "to support he and his mother in decreasing his impulsivity, distractibility and occupational behavior." AR 378. She also found that M.R.E. would benefit from further psychiatric evaluation and possible medication management, in order to address his symptoms of ADHD and ODD. AR 380.

On June 22, 2011, Dr. Salvacion Bonete, a psychiatrist at Steinway, evaluated the claimant. AR 369. M.R.E. was six years old at the time, and had previously been diagnosed with ADHD, combined type, and ODD, rule out bipolar disorder, by Dr. Jose Vito on March 21, 2009. AR 369.[6] M.R.E. was prescribed Concerta, 72 mg, and Risperidone, 2 mg. AR 369.[7] Despite these

present with symptoms of frequent and persistent patterns of anger, irritability, arguing, and defiance or vindictiveness toward authority figures. Diseases & Conditions: Oppositional defiant disorder (ODD), Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/oppositional-defiant-disorder/basics/definition/con-20024559 (last visited May 19, 2017).

[6] The notes from Dr. Vito's March 21, 2009, psychiatric evaluation, which contain this diagnosis, were provided to the Appeals Council but were not submitted to the ALJ. AR 544-47.

[7] Concerta is used to treat ADHD by increasing attention and decreasing restlessness in overactive patients. Drugs & Supplements: Methylphenidate (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/methylphenidate-oral-route/description/drg-20068297 (last visited May 19, 2017). "Risperidone is used to treat schizophrenia, bipolar disorder,

4

medications, Plaintiff reported that M.R.E.'s ADHD symptoms had escalated; M.R.E. was constantly provoked and provocative of other students in his school, and prone to aggressive outbursts. AR 369.[8]

Dr. Bonete found that M.R.E. was cooperative and relatable throughout much of the evaluation, but could be resistant and oppositional to direction at times. AR 370. Generally, the claimant appeared to be in an excited mood - he was fidgety, restless, talkative, and unable to sit still - and was easily distracted. AR 370. Although he was fully oriented and displayed an appropriate affect, M.R.E.'s concentration was impaired, and he demonstrated poor judgment, insight, and impulse control. AR 371-72. Dr. Bonete diagnosed M.R.E. with ADHD, combined type, and ODD, rule out bipolar disorder. AR 373. She also assigned him a global assessment of functioning ("GAF") score of 48, which indicates a serious impairment in social, occupational, or school functioning. AR 373.[9] Dr. Bonete added a prescription for Ritalin, 5 mg, in response to an exacerbation of M.R.E.'s ADHD symptoms.[10] She also recommended that he continue with

---

or irritability associated with autistic disorder." Drugs and Supplements: Risperidone (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/risperidone-oral-route/description/drg-20067189 (last visited May 19, 2017).

[8] M.R.E. was then in a regular rather than special education class of 30 students, with three teachers, and traveled to school in a bus with 25 other children. AR 369. His mother believed that he would benefit from a smaller class setting with more supervision. AR 369.

[9] The GAF tests a patient's level of functioning along a continuum of mental health, from 1 to 100. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

[10] Ritalin, like Concerta, is a central nervous system (CNS) stimulant used to treat ADHD. Drugs & Supplements: Methylphenidate (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/methylphenidate-oral-route/description/drg-2006 8297 (last visited May 19, 2017). Dr. Bonete also increased M.R.E.'s dosage of Risperidone, and directed him to continue taking Concerta. AR 373.

behavioral therapy and, if practicable, be placed in a smaller class setting with more structure and supervision, as well as a school bus with fewer children and a school bus monitor. AR 373.

On June 30, 2011, Ms. McEvoy noted that the claimant continued to struggle with aggressive outbursts. AR 374. Additionally, M.R.E. demonstrated difficulty accepting limits, managing his responses to provocation, and was often provocative in his interactions with classmates. AR 374. Ms. McEvoy found that the claimant was intelligent, curious, and capable of interacting in a friendly and engaging manner, but struggled with impulsivity, hyperactivity, and difficulty focusing, while also exhibiting oppositional behavior. AR 374. Although M.R.E. made progress toward decreasing the intensity of these symptoms, Ms. McEvoy found that he continued to struggle "significantly with aggression at school, which [was] getting in the way of overall functioning and peer relationships." AR 376.

On August 16, 2011, Dr. Bonete and Ms. McEvoy wrote to the New York City Department of Education ("DOE") concerning M.R.E.'s academic placement. AR 263.[11] They indicated that M.R.E. continued to struggle with aggressive outbursts and had difficulty managing his behavior. AR 63. They believed that he would benefit from a smaller educational setting which could provide "more intensive, hands-on support [.]" AR 263.

M.R.E. was discharged from Steinway on September 14, 2011. AR 367-68. According to a summary prepared by Ms. McEvoy on the same date, M.R.E.'s symptoms "fluctuated significantly" over the course of treatment. AR 367. After a period of sustained improvement, M.R.E. began displaying increased aggression, difficulty accepting limits, and poor frustration tolerance. AR 368. The claimant was therefore transferred to Bellevue Hospital's Child and Adolescent Day Treatment Program (the "Bellevue Program"), where he could receive a higher level of care. AR 368. The

---

[11] A duplicate copy of this letter was submitted to the Appeals Council. AR 563.

final diagnoses rendered by Ms. McEvoy was consistent with the prior findings: ADHD, combined type, and ODD, rule out bipolar disorder. AR 368. At the time of his discharge from Steinway, M.R.E. had been prescribed Concerta, 72 mg, Ritalin, 5 mg, and Risperidone, 2.5 mg. AR 374.

### ii. Bellevue Hospital's Child and Adolescent Day Treatment Program[12]

M.R.E. enrolled in the Bellevue Program in the Fall of 2011, through which he was placed in a highly structured educational setting at PS 35, and was provided psychiatric care and individual therapy on a weekly basis. ECF Nos. 19, at 13-14; 23, at 7. On December 15, 2011, M.R.E. met with Debra McVey, a licensed clinical social worker (" LCSW"). AR 434. Ms. McVey noted that the claimant could follow directions, did not "boss other peers," and was able to complete his school work. AR 434. On the following day, December 16, M.R.E. saw Dr. Eric Alcera, who reported that M.R.E. had been struggling to follow directions at school. AR 435. Dr. Alcera noted that the claimant was cooperative, well-related, oriented, alert, and possessed normal judgment and insight. AR 435. He diagnosed M.R.E. with ADHD, with significant hyperactivity and inattention, as well as a history of aggression. AR 436.

On December 19, 2011, Courtney Karp, a social work intern, met with M.R.E. for a weekly therapy session. AR 431. M.R.E. reported that he was "fine," but provided poor eye contact. AR 431. Otherwise, he was cooperative, alert, and oriented, and his insight and judgment were both

---

[12] The Bellevue Program "provides a comprehensive hospital-based 12-month psychiatric and educational program for 'emotionally disturbed students aged 5-19 years who are unable to function in a less restrictive school environment,' providing classroom instruction with 'weekly individual psychotherapy and weekly group therapy, including Anger Management groups.' " ECF No. 19, at 13 n. 16 (quoting http://childrenofbellevue.org/child-adolescent-psychiatry/outpatient-psychiatric-care/.). The academic component of the Bellevue Program is known as the PS 35 Riverview School @ Bellevue Hospital Center. AR 260; ECF No. 19, at 13 n. 16.

intact. AR 431. On December 20, 2011, Dr. Kathryn Kavanaugh, a psychologist, and Christina Laitner, a psychology extern, co-authored notes which described M.R.E.'s struggles in the classroom. AR 433. He had difficulty waiting his turn and frequently requested to be called on by his teachers before other students. AR 43. When he was not, he became "vocal." AR 433. Ms. Karp and M.R.E. met once again on December 22, 2011. AR 437. M.R.E. had been "acting out" in class, and was very upset when confronted about his behavior. AR 437. The claimant also reported that he and his family would soon be moving to the Bronx, which made him feel overwhelmed and anxious. AR 437.

On January 3, 2012, Dr. Kavanaugh and Ms. Laitner described that M.R.E. often "pout[ed] and whine[d]" when he was not called on before other students. AR 439-40. The claimant could also "be bossy with his peers." AR 440. At the same time, Dr. Kavanaugh and Ms. Laitner noted, M.R.E. actively sought interpersonal connections with his classmates, and was motivated by the point system in place at school, which rewarded good behavior. AR 440.

On January 10, 2012, Dr. Alcera wrote that M.R.E. continued to exhibit "some oppositional behavior," although the intensity and frequency of such outbursts had decreased. AR 443. Citing a recent school report, Dr. Alcera noted that M.R.E. performed adequately academically. AR 443. Results from a mental status examination were also unremarkable. AR 443.[13] Dr. Alcera diagnosed ADHD, but noted that, generally, M.R.E.'s symptoms continued to improve, as demonstrated by the decreased frequency and intensity of his outbursts. AR 444. On January 20, Ms. Karp and M.R.E. met for a weekly therapy session. AR 457. M.R.E. reported being "happy," and that he was in a good mood, excited for his upcoming eighth birthday. AR 457. He had also been performing well

---

[13] For example, M.R.E. was cooperative, well-related, and normally behaved; he demonstrated adequate eye contact, normal speech and thought content, and intact insight and judgment; he was alert and oriented, and did not exhibit aggressive ideations. AR 443.

and behaving in class. AR 457.

On January 24, 2012, Dr. Kavanaugh, along with Debroh Zlotnik, a psychology extern, noted that M.R.E. participated actively and appropriately in group activities. AR 445. Indeed, he "encourage[d] his peers not to get upset when they were not winning" during a class exercise. AR 445. On January 26, Ms. Karp reported that M.R.E. had "been doing really well and will soon be ready to move on to a new school." AR 459. On January 27, Dr. Kavanugh and Ms. Zlotnik wrote that M.R.E. demonstrated good behavioral control, was not disruptive, and appeared fully engaged in group activities. AR 447. Once again, on February 3, M.R.E. was an active, and appropriately behaved, participant in group activities. AR 451.

Also on February 3, 2012, M.R.E. met with Ms. Karp, appearing in a good mood, and with a cooperative attitude. AR 453. Ms. Karp noted that M.R.E. spoke at a normal rate and rhythm, "varying between a normal volume and very loud outbursts when [he became] excited." AR 453. The claimant sat still in his chair during the session, and demonstrated sound insight and judgment. AR 455. On February 9, however, he apparently regressed; as Dr. Kavanaugh and Ms. Zlotnik noted, M.R.E. exhibited hyperactive behavior, impulsivity, and difficulty focusing during group exercises. AR 450. Nevertheless, they noted, M.R.E. could be redirected to engage in appropriate behavior when instructed to do so. AR 450.

On February 13, 2012, Dr. Alcera reported that M.R.E. was compliant with his medications. AR 465. A mental status examination was normal, and Dr. Alcera noted that M.R.E.'s aggression and outbursts in class had improved. AR 465. As of February 16, M.R.E. was once again comporting himself well in the classroom. AR 461. Dr. Kavanaugh and Ms. Zlotnik described his euthymic mood and active, appropriate behavior, as well as his positive responses to verbal praise and reinforcement. AR 461. Also on February 16, M.R.E. met with Ms. Karp; although he

appeared calm, he was easily distracted and had to be redirected multiple times throughout the session. AR 463. Ms. Karp indicated that M.R.E. had "done very well behaviorally in school over the past month, earning [moderate scores] on the behavioral point sheet." AR 463.[14] When they met again on the following day, February 17, Ms. Karp noted that the claimant was calm, cooperative, alert and oriented. AR 468. His mood was euthymic and he required little redirection throughout the therapy session. AR 468.

According to notes prepared by Ms. Zlotnik on March 1, 2012, M.R.E. was generally on task during class exercises. Ar 470. Although he demonstrated hyperactivity and impulsivity, the claimant participated actively and appropriately with his classmates. AR 470. Additionally, Ms. Zlotnik noted, M.R.E. was responsive to positive reinforcement of his good behavior, and generally well behaved. AR 471. Ms. Zlotnik's notes from March 8 are substantively indistinguishable from the above. AR 475.[15] On March 9, Ms. Karp and M.R.E. discussed a recent altercation in which he bullied a classmate on the school bus. AR 473. M.R.E. was calm and cooperative; he understood that his actions were unnecessary and hurtful. AR 473. On March 19, Dr. Alcera noted that M.R.E. was "doing well, with no noted difficulties at home and at school." AR 479. A mental status examination was once again normal. AR 479.[16]

---

[14] Plaintiff corroborated M.R.E.'s good behavior during a telephone call with Ms. Karp on the same date. AR 467. According to Ms. Karp, Plaintiff said that her son had "been doing very well" and had recently attended a Bible study class where he "kept himself occupied quietly and appropriately." AR 467.

[15] As Ms. Zlotnik did in her previous notes, she once again described that the claimant presented in a "a euthymic mood and his behavior was generally on task. However, he continued to demonstrate[] hyperactivity and impulsivity. [M.R.E.] was responsive to verbal praise and reinforcement of positive behaviors." AR 475.

[16] M.R.E. was cooperative, his thought process and content were both normal, he had no aggressive or homicidal ideations, his mood was euthymic, his affect was appropriate and full, his impulse control was intact, and he was alert and oriented. AR 470.

On March 22, Ms. Zlotnik provided an apparently conflicting account of M.R.E.'s behavior in class. On the one hand, she noted, he was generally on task and well behaved; at the same time, however, M.R.E. "often told tangential stories that were not on topic and it was difficult to redirect him." AR 481. On March 23, Ms. Karp met with M.R.E. to discuss a recent threat he had made to a fellow classmate while on the school bus. AR 484.[17] M.R.E. explained that he threatened the other student because he was annoyed with her and wanted to scare her. AR 484. He made sparse eye contact during the session, but was readily redirected. AR 484.

M.R.E. met with Ms. Karp once again on March 30, 2012, at which time he admitted that his threatening actions the previous week were "wrong" and that he and his classmate were "fine." AR 486. Although M.R.E. appeared happy at the beginning of the meeting, he grew upset after discussing his transition to a new school. AR 486-87.[18] On April 3, the claimant met once again with Ms. Karp for an individual therapy session. AR 492. M.R.E.'s mood vacillated over the course of the session, "ranging from happy when discussing [his] good behavior to depressed when upcoming transitions were discussed." AR 493. The claimant was otherwise alert and oriented, with his thought process coherent and goal-directed. AR 492.

M.R.E. presented to Ms. Zlotnik on April 5, 2012, in an irritable mood; he had continuously been provoked by one of his classmates. AR 490. M.R.E. threatened to fight the classmate, and Ms. Zlotnik noted that he demonstrated hyperactivity and impulsivity throughout the group meeting. AR 490. On April 9, 2012, Dr. Alcera reported that the claimant remained compliant

---

[17] M.R.E. apparently told his classmate, "my mom is in the FBI and she will bring her tank to school and shoot you with it." AR 484.

[18] M.R.E. would soon be leaving the Bellevue Program to begin attending PS 96, and receiving outpatient treatment through Astor Services for Children and Families in the Bronx, New York. See ECF Nos. 19, at 17; 23, at 11; see also AR 520, 530, 554.

with his medication, and that both home and school reports showed that M.R.E.'s attention and focus had improved. AR 494. M.R.E. was also less irritable and argumentative, and "more flexible", complying "without difficulty with staff, teachers and [his] mom." AR 494. A mental status examination was normal. AR 494. Dr. Alcera observed that M.R.E. was generally doing better but still suffered from significant hyperactivity and inattention. AR 495.

On April 13, 2012, Plaintiff informed Ms. Karp that M.R.E., who was home from school at the time on a scheduled break, had been "difficult" but "not out of control." AR 496. Indeed, Plaintiff was capable of redirecting M.R.E. to behave appropriately, but it often required threatening to call the police or a hospital to calm him down. AR 496. Upon his return to school, on April 16, M.R.E. met with Ms. Karp for an individual therapy session. AR 500. Although the claimant remained cooperative and calm throughout the session, he told Ms. Karp that he sometimes felt as though he was incapable of controlling himself. AR 500. On April 19, Ms. Zlotnik noted that M.R.E. had been verbally aggressive toward a classmate, but "responded well to redirection and was [thereafter] able to use effective problem solving skills to resolve peer conflict." AR 498. Aside from the initial conflict, M.R.E. was generally on task and well-behaved. AR 498.

Ms. Karp, who was leaving the Bellevue Program at the end of the month, met with M.R.E. for the final time on April 27, 2012. During their meeting, they discussed a minor altercation between the claimant and other students on the bus, and went out for ice cream to celebrate M.R.E.'s otherwise good behavior. AR 502. Ms. Karp noted that, in general, the claimant got along well with his peers and was well-behaved. AR 502. During the meeting M.R.E. interacted with Ms. Karp in a friendly and appropriate manner. AR 502.

In group sessions on both April 26 and May 3, 2012, M.R.E. became verbally aggressive toward a classmate, but responded well to redirection. AR 504, 506. As Ms. Zlotnik wrote, M.R.E.

appropriately sought extra help from the staff and generally behaved well after the initial conflict. AR 504, 506. On May 10, Ms. Zlotnik reported that M.R.E. was generally on task and interacted well with his peers. AR 488. The claimant responded well to redirection from his teachers and demonstrated "good team work." AR 488.

Also on May 10, 2012, M.R.E. met with Debra McVey, who had replaced Ms. Karp as his therapist at the Bellevue Program. AR 508. Ms. McVey noted that M.R.E. had a short temper in the classroom, and was incapable of responding to redirection from his teachers. AR 508. Less than one week later, on May 16, Dr. Alcera wrote that M.R.E. was doing well in the program, remaining "engaged academically with minimal to nil tantrums or outbursts." AR 509. M.R.E. exhibited good behavior at home and continued to demonstrate improved frustration tolerance at school. AR 509. A mental status examination was unremarkable; M.R.E. was alert, oriented, and cooperative. AR 509.

On May 24, 2012, Ms. Zlotnik rendered an apparently conflicting account of M.R.E.'s behavior during group activities. AR 512. She began her narrative by stating that the claimant was generally on task and well behaved during the group activity, but wrote in the next sentence that he "demonstrated bossy behavior towards group members." AR 512.[19] On May 25, Plaintiff spoke with Ms. McVey to inform her that M.R.E. was having trouble getting along with two peers in his after school program. AR 512.

M.R.E. told Ms. McVey on June 1, 2012, that he felt "in control" and did not think he required more medication. AR 515. He reported that two students in his after school program were

---

[19] Ms. Zlotnik gave the same description when she entered her notes the following week, on May 31. AR 514 (writing that M.R.E.'s "behavior was generally on task and he was generally well behaved during group. [M.R.E.] demonstrated bossy behavior towards group members.").

being provocative by "always saying bad or mean things" about his mother, but he was able to ignore them. AR 515. On June 8, Ms. McVey noted that M.R.E. behaved well in class over the previous week. AR 515. According to Ms. Zlotnik's notes of June 14, 2012, M.R.E. was generally on task and interacted well with his peers. AR 517. On the following day, June 15, Ms. McVey noted that M.R.E. was "doing better" in the after school program. AR 518. Plaintiff also reported that the claimant's behavior at home had improved. AR 518. On June 22, Ms. Mcvey wrote that M.R.E. had a good week, and was able to play with a classmate without "being too bossy[.]" AR 519.

Dr. Alcera, writing on July 11, 2012, noted that M.R.E. did not have any tantrums or aggressive outbursts in the previous month. AR 520. The claimant continued to show improvement in his behavior at school; his attention, focus, and mood were each considered "good" as well. AR 520. M.R.E. was compliant with his medications, and a mental status examination was normal. AR 520. On the same day, July 11, Ms. McVey met with M.R.E. for an individual therapy session. AR 523. They discussed a recent altercation between the claimant and a classmate of his during an after school program, wherein the claimant threatened to hit the peer for jumping ahead of him in line. AR 523. M.R.E., according to Ms. McVey, "agreed that learning is more important ... than being the first on line." AR 523.

On July 20, 2012, Ms. McVey wrote that M.R.E.'s anger management had improved. AR 524. She had also spoken with Plaintiff, who confirmed that the claimant would begin attending PS 96 in the fall and receiving additional care from Astor Services for Children and Families, a clinic located in the Bronx, New York. AR 524. Both Ms. McVey and Plaintiff "agreed that [M.R.E.] improved and he did great in the [Bellevue Program]." AR 524.

### iii.    PS 35 Riverview School[20]

At the end of the Spring Term of 2012, M.R.E.'s principal at PS 35, Marta Barnett, completed a report card which detailed the claimant's social behavior. AR 260. According to Ms. Barnett, M.R.E. demonstrated a low threshold and tolerance for others, and got "set off very easily." AR 260. She also noted that M.R.E. had a difficult time recovering from spells of frustration. AR 260. Although he had good friends in the class, with whom he interacted on a daily basis, he could, according to Ms. Barnett, stand to "learn to keep an indoor voice and how to keep himself together in a group setting." AR 260.[21]

### b.    Records Post-dating Plaintiff's SSI Application

### i.    Bellevue Hospital's Child and Adolescent Day Treatment Program

On July 27, 2012, Ms. McVey noted that the claimant had another good week in school, where he continued to display behavioral improvement. AR 525. M.R.E. acknowledged that he was in better control of his anger, and that he had made many friends at the Bellevue Program whom he would miss upon leaving. AR 525. Ms. McVey, speaking on behalf of the staff, wrote that "we will miss him also, and it's nice to see him mature so nicely." AR 525.

---

[20] PS 35 Riverview School is the academic component of the Bellevue Program. AR 260; ECF No. 19, at 13 n. 16. It is part of the DOE's "District 75" program, which "provides citywide educational, vocational, and behavior support programs for students who are on the autism spectrum, have significant cognitive delays, are severely emotionally challenged, sensory impaired and/or multiply disabled." ECF No. 19, at 13-14 n. 16 (quoting http://schools.nyc.gov/Academics/SpecialEducation/D75/Programs/default.htm).

[21] The report card also addressed M.R.E.'s proficiency in math and literacy. He was generally strong in all areas of literacy, and reading at grade level, but could occasionally benefit from encouragement and time limits in order to complete his work. AR 260. M.R.E. enjoyed learning math, but tended to look at problems quickly, which led to careless mistakes. AR 260.

On August 14, 2012, Dr. Alcera noted that M.R.E. had continued to do well behaviorally, and did not exhibit any tantrums or outbursts over the prior month. AR 527. A mental status examination revealed that M.R.E. had a good mood and full affect. AR 527. The claimant was compliant with his medications and treatment, and got along well with his classmates. AR 527. Writing on August 16, Ms. McVey indicated that M.R.E. had perfect attendance over the previous two weeks, and had "matured as a person" over the course of the Bellevue Program. AR 529.

### ii.  PS 35 Riverview School

Ms. Susan Berman, the claimant's second grade teacher at PS 35, noted on a report card that M.R.E had "come a long way since the beginning of the year." AR 289. Although M.R.E. was still working on certain behavioral issues - using his "indoor voice" within the classroom - he was, "for the most part," able to control himself. AR 289.

On August 8, 2012, Ms. Berman completed a questionnaire at the request of the SSA. AR 248. She first found that M.R.E.'s ability to acquire and use information was not impaired. AR 249. Next, she found that, generally, M.R.E. had no difficulty attending and completing tasks, but had some trouble finishing his work within a reasonable period of time. AR 250.[22] With respect to interacting and relating with others, M.R.E. had "slight problems" in the categories of playing cooperatively with classmates, seeking attention and expressing anger

---

[22] On the questionnaire, there are a total of 13 categories listed under the domain of attending and completing tasks. AR 250. Of those categories, Ms. Berman indicated that M.R.E. had "no problem" in 12 of them, but an "obvious problem" with respect to "working at a reasonable pace/finishing on time." AR 250. She elaborated that, "[M.R.E.] always completes his work but most of the time he takes more time than the class. He seems to take his time writing so that everything is perfect [and] just so. He erases frequently." AR 250.

appropriately, and taking turns in conversation. AR 251.[23] Ms. Berman explained that M.R.E. often helped others in his class, "however sometimes [his] tone need[ed] to be adjusted." AR 251. She found that he could benefit from learning how to use an "indoor voice and a friendly tone when conversing with others." AR 251. Ms. Berman then indicated that M.R.E. had no problems in the domain of moving about and manipulating objects. AR 252.

With respect to the final domain of functioning, caring for himself or herself, Ms. Berman found that M.R.E. had an "obvious problem" being patient when necessary, and a "slight problem" with respect to handling his frustration and responding appropriately to changes in his mood. AR 253.[24] She noted that M.R.E. "can become very frustrated and drastic changes can occur. He becomes sullen when he doesn't get his way ... he has been able to control this more but it's still present." AR 253. On a separate form, also signed and dated August 8, 2012, Ms. Berman indicated that M.R.E.'s reading, writing, and math skills were commensurate with his grade level. AR 256.

### iii. PS 96

On October 21, 2012, Heather Sutorius, M.R.E.'s third grade teacher at PS 96, completed a questionnaire at the request of the SSA. AR 410. M.R.E. was in an integrated co-teaching ("ICT") class, with twenty-nine other students and two teachers. AR 410.[25] At the time she completed the

---

[23] There are a total of 13 categories listed on the form under the domain of interacting and relating with others; Ms. Berman found that M.R.E. had "no problem" in 9 of them. AR 251.

[24] Ms. Berman found that M.R.E. had "no problem" in many of the other categories under this domain, including knowing when to ask for help; appropriately asserting emotional needs; and using good judgment regarding personal safety and dangerous circumstances. AR 253.

[25] An ICT classroom allows for "the provision of specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students." 8 N.Y.C.R.R. § 200.6(g). These classes contain, at a maximum, no more than 12 students with

report Ms. Sutorius had taught the claimant for a period of roughly two months. AR 410.

Ms. Sutorius found that M.R.E. exhibited "slight problems" in nine of the ten categories listed under the domain of acquiring and using information. AR 411.[26] He had one "obvious problem" with respect to his ability to express ideas in the written form. AR 411. With respect to the domain of attending and completing tasks, Ms. Sutorius indicated that M.R.E. had obvious difficulties working without distraction and in sustaining attention during sports or play activities. AR 412. Generally, however, she indicated that the claimant could be re-focused to task, and had no problems completing his assignments or carrying out simple instructions. AR 412. Otherwise, Ms. Sutorius found that M.R.E. had "slight problems" in a number of other categories, such as paying attention when being spoken to directly and waiting to take turns. AR 412.[27]

With respect to interacting and relating with others, M.R.E. exhibited "slight problems" in five categories: playing cooperatively with classmates; seeking attention; expressing anger; asking permission appropriately; as well as following rules. AR 413. Otherwise, M.R.E. had "no problem" in each of the eight remaining categories listed on the form. AR 413.[28] Like Ms. Berman,

---

disabilities, and, at a minimum, a special education teacher and a general education teacher. 8 N.Y.C.R.R. §§ 200.6(g)(1)(ii), (g)(2).

[26] These categories include: comprehending oral instructions; understanding school and content vocabulary; reading and comprehending written material; comprehending and doing math problems; understanding and participating in class discussions; providing organized oral explanations and adequate descriptions; learning new material; recalling and applying previously learned material; and applying problem-solving skills in class discussions. AR 411.

[27] The other categories listed are: focusing long enough to finish assigned activities or tasks; refocusing to task when necessary; carrying out multi-step instructions; changing from one activity to another without being disruptive; organizing his own things or school materials; completing work accurately; and working at a reasonable pace. AR 412.

[28] These categories include: making and keeping friends; respecting/obeying adults in authority; relating experiences and telling stories; using language appropriate to the situation and listener; introducing and maintaining relevant and appropriate topics of conversation; taking

Ms. Sutorius found that M.R.E. had no difficulty in the domain of moving about and manipulating objects. AR 414. As to his ability to care for himself, however, Ms. Sutorius noted that M.R.E. had "slight problems" in five categories, with "no problems" in five others. AR 415. He had slight difficulties handling frustration appropriately; being patient when necessary; identifying and appropriately asserting emotional needs; responding appropriately to change in his mood; and using appropriate coping skills to meet daily demands of the school environment. AR 415.[29]

### iv. Astor Services for Children and Families

On September 13, 2012, staff members at Astor Services for Children and Families ("Astor Services") in the Bronx, New York, prepared an intake form in connection with M.R.E.'s admission into their comprehensive outpatient program. AR 404. Upon admission, M.R.E. was diagnosed with disruptive behavior disorder and ADHD. AR 404. Atara Hiller, a doctoral intern in psychology with Astor Services, met with M.R.E. for weekly therapy sessions. AR 422. On April 3, 2013, she authored a letter which indicated that the claimant had been diagnosed with ADHD and disruptive behavior disorder; he was then taking Vyvanse, 60 mg, to address these conditions. AR 422.[30] According to Ms. Hiller, although M.R.E. continued to make progress, he still had some

---

[29] turns in a conversation; interpreting the meaning of facial expressions, body language, hints, or sarcasm; and using adequate vocabulary and grammar to express ideas and thoughts in general, everyday conversation. AR 413.

[29] Ms. Sutorius indicated that M.R.E. had no difficulty taking caring of his personal hygiene; caring for his personal needs; taking his medications; using good judgment with respect to personal safety and dangerous circumstances; and knowing when to ask for assistance. AR 415.

[30] Vyvanse is an ADHD medication which increases attention and decreases restlessness in patients who are overactive, cannot concentrate for long periods of time, or are easily distracted and impulsive. Drugs & Supplements: Lisdexamfetamine Dimesylate (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/lisdexamfetamine-dimesylate-oral-route/descripti on/drg-20070888 (last visited May 19, 2017).

difficulty managing his anger, impulsivity, hyperactivity, and ability to focus at home and at school. AR 422. On November 6, 2013, an Astor Services nurse whose name is illegible completed a treatment plan. AR 539. The nurse indicated that M.R.E. possessed a good attitude and was able to complete his work, but continued to suffer from hyperactivity, impulsivity, inattention, irritability, and a labile mood. AR 539.

### c. Other Evidence

#### i. SSA Consultant: Dr. Altmansberger

On August 20, 2012, Dr. R. Altmansberger, a non-examining Agency consultant, considered the record that was submitted to date and determined that M.R.E. was not disabled. AR 91. Relying on Ms. Berman's responses to the teacher questionnaire, Dr. Altmansberger determined that M.R.E. had no limitation in the domain of acquiring and using information. AR 89. He then found that M.R.E. suffered from less than marked restrictions in the domain of attending and completing tasks. AR 90. Once again, he based this determination on Ms. Berman's responses to the teacher questionnaire. AR 90. He also relied on notes from the Bellevue Program, citing to a mental status examination on May 16, 2012, wherein Dr. Alcera found that M.R.E. was doing well and was stable on his medication regimen. AR 90. Dr. Altmansberger found that the claimant possessed less than marked restrictions in the domains of interacting and relating with others, health and physical well-being, and caring for himself. AR 90. The consultative doctor concluded that M.R.E. was not limited in the domain of moving about and manipulating objects. AR 90.

In the narrative section of his report, Dr. Altmansberger explained that by most accounts M.R.E. was doing well, had improved at the Bellevue Program, and was stable on his medication. AR 90. M.R.E.'s mental status examination results, moreover, fell within normal limits. AR 90. The claimant was repeatedly found to be cooperative, not aggressive, and in a euthymic mood. AR

90. In addition to Dr. Alcera's notes, Dr. Altmansberger relied heavily on Ms. Berman's teacher questionnaire. AR 91. Otherwise, the consultative doctor noted, the record lacked any opinionative evidence form any other sources. AR 91.

### ii.    Function Report

On July 24, 2012, Plaintiff completed a Function Report in connection with her son's application for SSI benefits.[31] She indicated that M.R.E. had difficulty making new friends and getting along with her and other adults. AR 230. He would often hit, argue, and lose control, but Plaintiff noted that the program he was then attending - Bellevue - was helping him resolve these issues. AR 230. Plaintiff indicated that M.R.E.'s ability to care for himself was unimpaired. AR 231. She described slight difficulties in M.R.E.'s capacity to pay attention and adhere to tasks; he could keep busy on his own, finish things he started, work on projects, and complete most chores, but not his homework. AR 232.

### iii.    August 21, 2013, Hearing

The first of two administrative hearings was held on August 21, 2013. AR 71. Both Plaintiff and Dr. Sriti Vishan Resicart, a medical expert, testified at the hearing. AR 70. Plaintiff and the claimant did not appear with counsel. AR 72.

### A.    Plaintiff's Testimony

The ALJ first informed Plaintiff of her right to proceed with an attorney, and gave her the option to adjourn the hearing so that she may attempt to find counsel. AR 72. Plaintiff opted to go forward without an attorney. AR 72.

---

[31] Plaintiff also completed an undated Disability Report, which accompanied the claimant's application, submitted on July 24, 2012. AR 237. She alleged that M.R.E. had ADHD and bipolar disorder, conditions which became disabling on January 20, 2004, when the claimant was born. AR 238.

Plaintiff testified that M.R.E., who was nine and one-half years old at the time, was disabled as a result of his ADHD and extreme hyperactivity, conditions which led to "incidents within the school[.]" AR 73. The claimant had apparently been out of school for approximately six months before beginning at the Bellevue Program. AR 74. She explained that her son was accepted into the program because his previous school could no longer handle his out of control behavior. AR 73. At that prior school, M.R.E. was hyper, unable to focus, and "very destructive"; he would hit the teacher as well as his classmates. AR 74-75.

M.R.E. was scheduled to begin attending PS 96 in September, where he would be placed in special education classes. AR 75-76. At the time, he was also receiving therapy and psychiatric treatment through Astor Services. AR 75-76. Plaintiff testified that M.R.E. made progress through treatment. AR 77. She added that, for at least half of the school day, M.R.E.'s medication kept his symptoms under control. AR 77.

### B. Dr. Sriti Vishan Resicart's Expert Testimony

Dr. Sriti Vishan Resicart, a board certified pediatrician, family physician, and internist, testified as a medical expert at the first hearing. AR 77. She diagnosed M.R.E. with ADHD, combined type; ODD; seasonal allergies; and problems with his primary support group and in school. AR 79. M.R.E. was taking Concerta, Risperidone, Depakote, and Ritalin at the time. AR 79.[32] Citing to notes from the Bellevue Program dated May through July, 2012, Dr. Resicart testified that M.R.E. was doing well and appeared stable on his medication. AR 80.

Dr. Resicart found that, looking at M.R.E.'s impairments in combination, the claimant

---

[32] Depakote is used to treat certain types of seizures, as well as bipolar disorder and migraine headaches. Drugs & Supplements: Depakote, Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/valproic-acid-oral-route/description/DRG-20072931 (last visited May 22, 2017).

neither met nor medically equaled the severity of listed impairment. AR 80-81. Turning next to the six domains of functioning, Dr. Resicart found as follows: M.R.E. had (1) a less than marked limitation in the domain of acquiring and using information, as demonstrated by the fact that he was below grade level in math and writing; (2) a less than marked limitation in the domain of attending and completing tasks, due to his attention deficit disorder; no limitation with respect to each of the next three domains - (3) interacting or relating with others, (4) moving about or manipulating objects, and (5) caring for himself; and (6) a less than marked limitation in the domain of health and physical well-being, because he suffered from seasonal allergies. AR 81.[33]

### iv. December 6, 2013, Hearing

A second hearing was held on December 6, 2013, where Plaintiff and M.R.E., appearing pro se, as well as Dr. Edward Halperin, a psychological expert, testified. AR 51.

### A. Plaintiff's Testimony

The ALJ began the hearing by reminding Plaintiff of her right to proceed with an attorney, and she responded that she wished to go forward pro se. AR 52. Plaintiff explained that she believed her son was disabled due to his diagnosis of ADHD. AR 54.[34] He remained "very

---

[33]After concluding with the testimony of the medical expert, the ALJ then asked Plaintiff if she wished to provide additional comments or follow-up questions. AR 82. Plaintiff then inquired into which records had been received from the Bellevue Program. AR 82. When the medical expert responded that she had a report from May through July, 2012, Plaintiff indicated that she had submitted a full year's worth of treatment notes from the Bellevue Program. AR 82-83. Plaintiff was particularly concerned that certain reports from Ms. McVey had been omitted from the administrative record. AR 83. The ALJ then advised her that he would review the record once again and request any missing documents in post-hearing development. AR 83. He then asked for the spelling of Ms. McVey's name as well as her phone number. AR 83-84. It appears that, after the first hearing, these records were received by the Agency, which prompted the ALJ to conduct a second hearing, in December, 2013.

[34] Plaintiff also testified that M.R.E. was disabled due to a "vision problem," explaining that he had a lazy eye. AR 55. She then testified that, despite this condition, her son could read, and M.R.E. then stated that he could do the same "sometimes." AR 55.

hyperactive," and had difficulty focusing in school. AR 55. M.R.E.'s medication tended to lose its effectiveness toward the latter part of the school day, at approximately 1:30 or 2:00 PM. AR 55. Plaintiff then testified that her son was enrolled in special education classes, but had never been asked to repeat a grade. AR 56. Additionally, he received treatment at Astor Services once or twice each week. AR 63. Plaintiff believed that the group therapy which M.R.E. received at school "help[ed] out through the day." AR 61.

### B. M.R.E.'s Testimony

M.R.E. testified that he had friends in school, but only enjoyed gym class, where he was able to run around. AR 57-58. Although he recognized that he misbehaved in school, he did "not really" believe it to be his fault. AR 59. M.R.E. described getting mad and throwing his book bag in the closet, before acknowledging that doing so was generally not a good idea. AR 60. He also described getting upset when he did not get his way. AR 60. M.R.E. stated that he liked the group therapy he received at school, which his mother also found helpful. AR 62. Outside of school he was friendly with other children in the neighborhood, and enjoyed playing basketball and soccer as well as listening to music on the radio. AR 58.

### C. Dr. Edward N. Halperin's Expert Testimony

Dr. Edward N. Halperin, a board certified adolescent psychiatrist, testified as a psychological expert at the second administrative hearing. AR 62. He began by noting M.R.E.'s diagnosis of ADHD, which was "responding moderately well" to Vyvanse. AR 65. The claimant had also been diagnosed with ODD, which Dr. Halperin described as a mild case, noting that there had been much less evidence of related symptoms in the chart than there were previously. AR 66.

Dr. Halperin testified that M.R.E.'s conditions did not meet nor equal the severity of a listed impairment. AR 66. As to the six domains of functioning, M.R.E. had less than marked limitations

with respect to acquiring and using information, attending and completing tasks, interacting and relating with others, and with respect to his health and physical well-being. AR 67. According to Dr. Halperin, M.R.E. did not suffer from any limitations in the domains of caring for himself or moving and manipulating objects. AR 67.

### 2. Evidence Submitted to the Appeals Council

On March 6, 2014, Plaintiff sought review of the ALJ's unfavorable decision by the Appeals Council. AR 25. In support of that appeal, she submitted additional records from the DOE, Astor Services, the Bellevue Program, and Steinway. AR 5-7. In its Notice of Denial of Review, the Appeals Council stated that it had considered this new evidence, but that it did not provide a basis for changing the ALJ's decision. AR 1-2.[35]

#### a. Records Pre-dating Plaintiff's SSI Application

##### i. DOE Records & M.R.E.'s Early Childhood Education

On November 2, 2009, Plaintiff wrote to the DOE, requesting that a full psychological test be provided to M.R.E. in order to determine if he was eligible for special education classes. AR 294.[36] M.R.E.'s kindergarten teacher also requested that he undergo an evaluation, citing the claimant's "defiant and aggressive behavior [which had become] so severe [that the teacher was] concerned about his safety to himself and his peers." AR 340.

---

[35] The Appeals Council wrote: "We found no reason under our rules to review the [ALJ]'s decision. Therefore, we have denied your request for review." AR 1. It noted that, in looking at M.R.E.'s case, it considered the reasons Plaintiff disagreed with the ALJ's decision and "the additional evidence listed on the enclosed Order of Appeals Council. We considered whether the [ALJ]'s action, findings, or conclusion is contrary to the weight of evidence currently of record (see 20 C.F.R. § 416.1470). We found that this information does not provide a basis for changing the [ALJ]'s decision." AR 1-2.

[36] Previously, on March 25, 2009, the DOE's Committee on Special Education recommended that the claimant be placed in a general education classrom. AR 294.

25

On January 13, 2010, Dr. Guadalupe Coll, a school psychologist, conducted a psycho-educational evaluation of M.R.E. AR 340. Dr. Coll found that the claimant was alert and active, but required constant attention and direction, throughout the evaluation. AR 341. He frequently grabbed nearby materials, and tried to climb on the table. AR 342.

M.R.E.'s verbal IQ score was in the average range, while both his performance and full scale IQ scores fell within the high average range. AR 342. On a Woodcock-Johnson test, M.R.E. scored in the 91st percentile in reading/coding and spelling, and the 95th percentile in math computing, placing his academic skills in reading, writing, and math above grade level and all in the "superior range." AR 343.

Dr. Coll concluded that M.R.E. lacked self-control and an ability to respond appropriately to authority and social constraints. AR 344. These behavioral limitations, the examiner opined, prevented the claimant from "functioning in a regular classroom despite his overall high level in cognitive and academic functioning." AR 344. Accordingly, Dr. Coll recommended that M.R.E. be provided an educational setting which had a crisis paraprofessional who could provide additional structure and individualized attention. AR 344.

On April 1, 2011, M.R.E.'s teachers prepared an Individualized Education Program ("IEP") for the claimant's upcoming 2011-2012 school year. AR 296-305. M.R.E.'s teachers found that he had difficulty controlling his anger and could be argumentative at times. AR 296-97. As noted elsewhere in the record, M.R.E. was described as having a low frustration tolerance and a susceptibility to distraction. AR 296. Although he responded well to praise and reinforcement, he often sought it when it was "not earned." AR 296. His teachers opined that he would benefit from special attention, repetition, redirection, and praise. AR 296. Accordingly, they recommended that M.R.E. be placed in an ICT classroom, and receive individual counseling on a weekly basis. AR

26

300.

## ii.    Steinway Child and Family Services

On March 21, 2009, Dr. Jose Vito of Steinway conducted a psychiatric evaluation of the claimant. AR 544. M.R.E.'s teachers had complained that he was hyperactive, oppositional, impulsive, and unable to focus on tasks in school. AR 544. Additionally, Plaintiff reported having difficulty with the claimant at home; he could not sit still and had tantrums. AR 544. Dr. Vito diagnosed the claimant with ADHD, combined type, ODD, rule out bipolar disorder, and seasonal allergies, while assigning him a GAF score of 50, indicating a serious impairment. AR 547. During a mental status examination, M.R.E. was uncooperative at times, easily distracted, and displayed poor impulse control and judgment, as well as a brief attention span. AR 545.

On January 12, 2010, Dr. Vito, along with Ms. McEvoy, the claimant's therapist at Steinway, wrote to the DOE in connection with determining M.R.E.'s appropriate educational placement. AR 548. At the time, the claimant's medications had recently been changed from Adderral XR, 30 mg, to Focalin XR, 20 mg, which he took on a daily basis, along with .5 mg of Risperidone. AR 548. According to Dr. Vito and Ms. McEvoy, M.R.E. was very bright, but struggled significantly with frustration tolerance, impulsivity, difficulty focusing, hyperactivity, oppositional behavior, and affect regulation. AR 548. In their joint opinion, M.R.E. had dual academic needs: "the need to be both challenged academically and socially, while also having the intensive support necessary to be successful in both of these realms." AR 548.

On April 6, 2011, Dr. Vito completed a form titled "Medical Report for Determination of Disability." AR 549. M.R.E. was seven years old at the time. AR 549. Although the claimant showed some behavioral improvement since beginning his treatment at Steinway, in February, 2009, significant symptoms persisted. AR 549. Dr. Vito noted that the claimant continued to

27

experience hyperactivity, difficulty focusing, impulsivity, difficulty regulating the tone and volume of his voice, excessive talking, low frustration tolerance, trouble regulating his emotions, difficulty accepting limits, frequently losing his temper, and he was argumentative as well as easily annoyed by others. AR 549. Dr. Vito opined that M.R.E.'s frequent mood swings and oppositional behavior would interfere with his responsibilities at home and at school, and lead to conflicts with peers. AR 549.

In a "Request for Medical Accommodations" form, completed on June 27, 2011, Dr. Salvacion Bonete and Ms. McEvoy indicated that M.R.E. suffered from several limitations as a result of his ADHD and ODD. AR 551.[37] They found that, although these limitations would improve over time, M.R.E. would require frequent support and redirection in order to remain on task and able to handle day-to-day stressors. AR 551. They also recommended that M.R.E. learn in a small class setting with support staff in addition to a lead teacher, "such that significant structure and support [could be] available." AR 551.

### iii. Bellevue Hospital's Child and Adolescent Day Treatment Program

On April 17, 2012, Ms. Berman, Ms. McVey, and Plaintiff, along with a school psychologist and district representative, completed an IEP for M.R.E.'s 2012-2013 school year. AR 306-16. They described the claimant as "a very respectful youngster who [got] along well and enjoy[ed] helping out with the younger students in his class." AR 306. M.R.E. had, according to the authors of the IEP, "come a long way fast" since beginning at the Bellevue Program; he was "no

---

[37] These limitations generally tracked those listed above in the April 6, 2011, Medical Report completed by Dr. Vito. For example, M.R.E. had difficulty with frustration tolerance, regulating impulses, focusing, handling his emotions, and, as a result, required frequent redirection. AR 551.

longer argumentative and [was] described as being a 'gentleman' [who was] easily redirected if there [was] a conflict, but ha[d] not been in conflict in a long while." AR 306. They recommended that the claimant receive counseling services twice weekly in a group setting, and once each week on an individual basis. AR 307. M.R.E. was also best suited for placement in an ICT classroom. AR 307, 310-11.[38]

On July 5, 2012, M.R.E.'s primary clinician, Ms. McVey, and attending physician, Dr. Alcera, completed a treatment plan. M.R.E. still carried the diagnoses of ADHD, combined type, ODD, and had a GAF score of 50. AR 564. He was taking Vyvanse, 50 mg, at the time. AR 564. The claimant was compliant with his medication, but his teacher, Ms. Berman, reported that he often lost focus, and patience, near the end of the school day. AR 564-65. The authors of the treatment plan noted that, although M.R.E. got along nicely with older classmates, he continued to boss around his peers. AR 565. Overall, however, M.R.E.'s teachers noted that he was less easily agitated. AR 565.[39]

### b.     Records Post-dating Plaintiff's SSI Application

#### i.     PS 96

On November 26, 2012, Ms. Sutorius, along with school psychologist and district representative Jose Roque, social worker Helen Crespo, general education teacher Diana Shkreli, and Plaintiff completed an updated IEP for M.R.E.'s 2012-2013 school year. Although he "tried

---

[38] With respect to testing accommodations the IEP provided for 50% additional time, placement in a separate, quiet location with minimal distractions in a group size no greater than 12 students, and directions and re-reading allowed in all state and local examinations. AR 312.

[39] On August 7, 2012, shortly before M.R.E.'s discharge, staff members at the Bellevue Program issued a final treatment plan. AR 566-67. Again, notes indicated that M.R.E. was compliant with his medication, but tended to lose focus near the end of the school day. AR 567. The claimant continued to be bossy with his classmates, and showed less patience in his class later in the afternoon. AR 567.

hard to stay on task," M.R.E. continued to experience difficulty focusing, and could often get "fidgety," in the classroom. AR 345-46. The authors of the IEP nevertheless described him as "well behaved," "respectful," and having a "good attitude." AR 345.

On March 19, 2014, Ms. Sutorius completed a second teacher questionnaire. AR 331-39.[40] At the time she completed the questionnaire, Ms. Sutorius had known the claimant for two years, and was teaching him five days each week for the duration of the school day. AR 331. Although M.R.E. was in the fourth grade, his reading and math were at third grade levels, and his written language skills were at a second grade level. AR 331. Ms. Sutorius noted that the claimant was generally able to function well in an ICT class setting, where he received extra attention, support, and structure. AR 337.

With respect to the domain of acquiring and using information, Ms. Sutorius found that M.R.E. had "slight problems" in nine of the ten categories which appeared on the questionnaire, and an "obvious problem" expressing his ideas in written form. AR 332.[41] Ms. Sutorius noted that the claimant was approaching grade level in most areas, but required "a lot of structure and explicit

---

[40] Attached to the questionnaire was a letter, dated March 7, 2014, addressed to Plaintiff, which was completed by Ms. Sutorius, and a Mrs. Nikaj, the claimant's second grade teacher. AR 339. As the teachers described, M.R.E.'s behavior in class that day had prevented him from completing any of his work, resulting in two additional homework assignments. AR 339. He had engaged in a series of disruptive acts, which he described as "fooling around," including: (1) standing on a toilet seat and breaking it; (2) shouting and calling out in class; (3) breaking a class pencil; (4) answering back to his teachers in a disrespectful manner; and (5) kicking his chair/desk and swinging his sleeves. AR 339. According to the teachers, M.R.E. refused to correct his behavior after he was given several chances to do so.

[41] The nine categories in which M.R.E. exhibited a "slight problem" included: comprehending oral instructions; understanding school and content vocabulary; reading and comprehending written material; comprehending and doing math problems; understanding and participating in class discussions; providing organized oral explanations and adequate descriptions; learning new material; recalling and applying previously learned material, and applying problem-solving skills in class discussions. AR 332.

instructions" with respect to writing. AR 332. M.R.E. also benefitted from a small group setting. AR 332.

As to the second domain of functioning, attending and completing tasks, Ms. Sutorius indicated that the claimant possessed a number of serious problems. AR 333. On a daily basis M.R.E. had difficulty refocusing to task when necessary, completing his homework assignments, finishing his work accurately without careless mistakes, and working without distracting himself or others. AR 333. Additionally, Ms. Sutorius found that the claimant had an "obvious problem" focusing long enough to finish assigned activities or tasks, changing from one activity to another without being disruptive, and working at a reasonable pace. AR 333. She also noted that M.R.E. had "slight problems" in several other categories within the second domain of functioning, such as paying attention when being spoken to directly and waiting to take turns. AR 333.[42]

The third domain of functioning fell under the title of "interacting and relating with others." Here, of the thirteen categories listed under this title, Ms. Sutorius found that M.R.E. exhibited a "serious problem" in expressing anger appropriately, five "obvious problems," six "slight problems," and no problem with respect to interpreting meaning of facial expression, body language, or hints. AR 334.[43] M.R.E. would get easily frustrated with his peers, and, at times, overreact when his classmates looked at him, which led to conflict. AR 334.

---

[42] The other categories in which M.R.E. exhibited a "slight problem" included: sustaining attention during sports activities or play, carrying out single-step instruction and multi-step instructions, and organizing his school materials or possessions. AR 333.

[43] The claimant had "obvious problems" playing cooperatively with others, seeking attention appropriately, following rules, respecting and obeying adults in authority, and using language appropriate to the situation and listener. AR 334. M.R.E. had "slight problems" making and keeping friends, asking permission appropriately, relating experiences and telling stories, introducing and maintaining relevant and appropriate topics of conversation, taking turns in conversation, and using adequate vocabulary and grammar to express his thoughts and ideas in everyday conversation. AR 334.

As to the fourth domain of functioning, moving about and manipulating objects, Ms. Sutorius opined that M.R.E. had "slight problems" with managing the pace of physical activities or tasks, and showing a sense of his body's location and movement in space. AR 335. He was often fidgety and wrote on his fingers, and, at times, required sensory stimulation to calm down. AR 335.

The next domain of functioning fell under the title of "caring for himself." Here, Ms. Sutorius found that M.R.E. exhibited "serious problems" responding appropriately to changes in his mood and using appropriate coping skills to meet the daily demands of the school environment. AR 336. The claimant exhibited "obvious problems" handling frustration appropriately, being patient when necessary, identifying and appropriately asserting his emotional needs, and knowing when to ask for help. AR 336. He had "slight problems" caring for his physical needs, taking his medications, and using good judgment regarding personal safety and dangerous circumstances. AR 336. Ms. Sutorius indicated that M.R.E. had no problem taking care of his personal hygiene. AR 336. She noted that M.R.E. often had difficulty beginning the school day in the morning, but could begin functioning appropriately within the first hour and a half of the day, and regress toward the end of the day, when he could become irritiable, especially on extended days. AR 336.

### ii. Astor Services for Children and Families

On August 27, 2012, an Astor Services employee, whose name appears illegible, completed an intake summary. AR 553. M.R.E. presented with ADHD and low frustration tolerance;[44] the primary goals of treatment were for him to improve his focus, behavioral control, and relationships with others. AR 555. A mental status examination revealed that the claimant was fully oriented, clear and logical in his speech and thought, and cooperative, but restless and hyperactive. AR 559.

---

[44] His symptoms included hyperactivity, impulsivity, poor attention span, poor school work, and behavioral problems in school. AR 556. In addition, he displayed aggression and oppositionality, which were listed as symptoms of ODD. AR 556.

32

His affect was happy, his mood euthymic, and his cognitive functioning largely intact. AR 560. He exhibited limited insight and impaired judgment. AR 560. The examiner diagnosed M.R.E. with disruptive behavior disorder ("DBD"), a history of ADHD, and scored his GAF level at 50. AR 560.

On the same date, Tisha John, a licensed mental health counselor ("LMHC"), met with M.R.E. for an initial assessment. AR 568. The claimant was cooperative and easily engaged in conversation. AR 568. Based on the history provided by Plaintiff and her own assessment of M.R.E., Ms. John found that there was sufficient evidence to support the diagnoses of DBD and ADHD, and to warrant admission for outpatient treatment. AR 568.

On September 25, 2012, M.R.E. met with Dr. Desmond Heath of Astor Services for a psychiatric assessment. AR 569-70. Dr. Heath diagnosed the claimant with ADHD, rule out bipolar disorder and stimulant-induced psychosis, and assigned a GAF score of 50. AR 569-70. The claimant intimated that he felt as thought others were looking at him, talking about him, and laughing at him at times. AR 570. Upon conducting a mental status evaluation, Dr. Heath noted that M.R.E. did not appear to have mood swings and denied OCD symptoms. AR 570.

On June 10, 2013, staff members at Astor Services noted that M.R.E. still took Vyvanse, 60 mg, as well as Vitamin E, 200 units, per day. AR 575. Although the claimant continued to experience symptoms related to ADHD, he had apparently been able to identify certain triggers which elicited anger, and began utilizing coping methods and problem-solving skills to better regulate his emotions. AR 576-77. Collaborative problem-solving techniques also proved successful in addressing the claimant's behavior at home. AR 577. The author of the treatment plan review wrote that M.R.E.'s ADHD symptoms had improved with medication, "and [he] continue[d] to succeed academically and behaviorally at school." AR 578. On September 10, 2013,

a nurse practitioner whose name is illegible on the document completed a medical only treatment plan, noting that M.R.E. continued to struggle from ADHD and took Vyvanse, 60 mg. AR 579.[45]

On April 1, 2014, LMSW Pinchus Brecher, LCSW June Helme, and Dr. Christina Atkin completed a treatment plan. AR 571-74. M.R.E.'s diagnosis of ADHD remained unchanged. AR 571. His disruptive, attention-seeking behavior persisted as well; he interfered with his classmates' attention and concentration by "talking excessively, blurting out remarks, speaking without permission, and laughing or making noises[.]" AR 572. The claimant continued to "talk back" to his teachers and mother, and would throw tantrums that lasted for long periods of time. AR 572. To treat these symptoms, the staff at Astor Services prescribed individual therapy with Mr. Brecher two to four times each month as well as monthly medication management with Dr. Atkin. AR 573.

On April 9, 2014, Enca Silen, a nurse practitioner, wrote that M.R.E. continued to exhibit impulsivity, inattention, hyperactivity, and irritability. AR 325. Ms. Silen described a recent incident in which the claimant apparently threw a tantrum in the street which led to emergency medical services being called. AR 325. According to Ms. Silen, M.R.E.'s symptoms had worsened in recent months, resulting in the need for increased medication and therapy visits. AR 325. In addition to an increase in the dosage of Vyvanse, from 60 to 70 mg, M.R.E. began taking Strattera, 18 mg, as well as participating in weekly therapy. AR 325.[46]

---

[45] A medication sheet from Astor Services confirms that M.R.E. was prescribed 70 mg of Vyvanse on November 26, 2012, which was changed to 60 mg the following month, and prescribed on a monthly basis thereafter through February, 2014. AR 541. Additionally, Astor Services prescribed Strattera, 10 mg, beginning on December 19, 2013. AR 541.

[46] Strattera is an ADHD medication, which works to decrease restlessness, and improve concentration. Drugs & Supplements: Atomoxetine (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/atomoxetine-oral-route/description/drg-20066904 (last visited May 19, 2017).

## II.    APPLICABLE LEGAL PRINCIPLES

### A.    Standard of Review

The scope of review in an appeal from a social security disability determination involves

two levels of inquiry.  First, the court must review the Commissioner's decision to determine

whether the Commissioner applied the correct legal standard when determining that the plaintiff

was not disabled.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).  Failure to apply the correct

legal standard is grounds for reversal of the ruling.  Townley v. Heckler, 748 F.2d 109, 112 (2d

Cir. 1984).  Second, the court must decide whether the Commissioner's decision was supported

by substantial evidence.  Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).

"Substantial evidence means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  Id. at 106 (internal quotation marks and citations omitted).

When determining whether substantial evidence supports the Commissioner's decision, it is

important that the court "carefully consider[] the whole record, examining evidence from both

sides."  Tejada, 167 F.3d at 774 (citing Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997)).  "It

is not the function of a reviewing court to decide de novo whether a claimant was disabled."

Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted).  If the "decision rests on

adequate findings supported by evidence having rational probative force, [the court] will not

substitute [its own] judgment for that of the Commissioner."  Veino v. Barnhart, 312 F.3d 578,

586 (2d Cir. 2002).

### B.    Determining Disability

The SSI program provides benefits to "needy aged, blind, or disabled individuals" who meet

certain statutory income and resource limitations.  Ruff ex rel. LMF v. Colvin, No. 14-Civ-2433

(RWS), 2015 WL 694918, at *8 (S.D.N.Y. Feb. 18, 2015) (citing 42 U.S.C. § 1381 et seq.).  A

35

child under the age of 18 is "disabled" for purposes of SSI eligibility if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

Pursuant to SSA regulations, an ALJ applies a three-step analysis to determine whether a particular child claimant is disabled. 20 C.F.R. § 416.924. First, the ALJ determines whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.924(b). If the claimant is not, the ALJ proceeds to the second step, where he or she considers whether the claimant has a medically determinable impairment which is severe. 20 C.F.R. § 416.924(c). An impairment is "severe" if it results in more than a "slight abnormality" or if it constitutes a "combination of slight abnormalities that causes ... more than minimal functional limitations." 20 C.F.R. § 416.924(c).

At the third and final step, the ALJ determines whether the claimant's impairment(s) meets, medically equals, or functionally equals the criteria of an impairment found in 20 C.F.R. Pt. 404 Subpt. P., App. 1 (the "listings"). 20 C.F.R. § 416.924(d). To "functionally equal" a listing, the claimant must demonstrate that his or her impairments "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. 416.926a. There are six domains of functioning: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) self-care; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). A "marked" impairment is one which is "more than moderate" but "less than extreme." 20 C.F.R. § 416.926(e)(2)(I). An "extreme" limitation is one which "interferes very seriously" with a child's ability to initiate, sustain, or complete activities; it is a rating reserved for the worst

limitations. 20 C.F.R. § 416.926(e)(3)(i).

## III. DISCUSSION

Plaintiff's instant lawsuit challenges the ALJ's unfavorable decision, which become the final determination of the Agency on July 24, 2015. AR 1-6. She asks this Court to reverse that decision and award benefits, or, alternatively, to vacate the decision and remand the case to the Agency for additional proceedings. ECF No. 1, at 5. Plaintiff raises four arguments in support of such relief. She contends that (1) the ALJ failed to develop the record; (2) the decision was not supported by substantial evidence; (3) the Appeals Council failed to provide "good reasons" for rejecting post-hearing treating source evidence when it denied Plaintiff's request for review; and (4) remand is appropriate in the "interests of justice." ECF Nos. 19, at 29-45; 23. For the reasons that follow, the Court recommends that the Agency's decision be vacated and the case be remanded for further proceedings consistent with this Report and Recommendation.

### A. The ALJ's Decision

On January 15, 2014, the ALJ issued a written decision denying Plaintiff's application for SSI benefits on behalf of M.R.E. AR 35-45. Performing the three-step analysis set forth above, the ALJ first determined that M.R.E. had not been engaged in substantial gainful activity since July 24, 2012, the date the application was filed. AR 38. At step two, he concluded that M.R.E. suffered from two severe impairments, asthma and ADHD. AR 38. At the third step, the ALJ concluded that M.R.E.'s impairments, whether considered singly or in combination, neither met, medically equaled, nor functionally equaled a listing. AR 38.

In reaching this conclusion, the ALJ found that Plaintiff's allegations regarding the severity of M.R.E.'s impairments were not supported by the evidence of record. AR 38. The ALJ noted that

M.R.E. did not require "full time therapy" and had been responding well to medication. AR 38. Moreover, mental status examination results were all within normal limits, and a May 16, 2012, examination, performed by Dr. Alcera of the Bellevue Program, stated that M.R.E. was doing well and was stable on his medication regimen. AR 38. The ALJ then considered the fact that the teacher evaluations of record did not find that M.R.E. had a marked limitation in any of the six domains of functioning. AR 38. Ms. Sutorius, on a teacher questionnaire from October, 2012, described M.R.E. as suffering from "slight problems" in some areas of functioning and "no problems" in others. AR 39. Likewise, the ALJ noted, consultative examiner Dr. Altmansberger and testifying expert Dr. Halperin both found that the claimant had less than marked limitations in various levels of functioning but never any marked or extreme impairments. AR 39. Although teacher reports described M.R.E.'s moderate difficulty in being patient, and his tendency to become moody when he did not get his way, other records noted an improvement in these behaviors. AR 39. As to the Astor Services records, the ALJ noted that the administrative file did not include progress notes or detailed assessments from M.R.E.'s treatment providers at the program. AR 40. Nevertheless, a letter from Ms. Hiller dated April 3, 2013, stated that, although the claimant had some difficulty managing his anger, impulsivity, hyperactivity, and ability to focus, he continued to make progress. AR 40.

The ALJ then considered M.R.E.'s limitations in reference to the six domains of functioning. AR 40-44. He found that M.R.E. had a less than marked limitation in the following four domains: acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical well-being. AR 40-44.[47] He also determined that the

---

[47] As to each of these domains, the ALJ relied on the opinions of Drs. Halperin and Altmansberger, both of whom found that the claimant had less than marked limitations, as well as Ms. Sutorious's October, 2012, teacher questionnaire. AR 41-44. With respect to the domain

claimant had no limitations in the domains of moving about and manipulating objects and caring for himself. AR 42-44.[48] Based on these findings the ALJ concluded the claimant did not have an impairment or combination of impairments that resulted in either marked limitations in two domains of functioning or an extreme limitation in one. AR 44. Accordingly, the ALJ concluded that M.R.E. was not disabled. AR 44.

## B.  **Duty to Develop the Record**

Plaintiff contends that the ALJ failed to develop the administrative record, particularly in light of the fact that M.R.E. was an unrepresented minor at the time of the hearing. ECF Nos. 19, at 29-41; 26, at 1-5. This error, Plaintiff argues, falls into two categories. First, she contends that the ALJ did not correct gaps in the psychiatric and academic evidence, errors which were compounded by the ALJ's failure to request an opinion from one of M.R.E.'s treating psychiatrists. Second, she argues that the ALJ did not conduct a full and fair hearing. The Court, for the reasons

---

of acquiring and using information, Ms. Sutorious indicated that M.R.E. had only slight problems. AR 41. As to the domain of attending and completing tasks, Ms. Sutorious wrote that M.R.E. would often be distracted but could be refocused to task and, aside from difficulties sustaining concentration and working with others, he had no more than slight problems in this area. AR 41. As to interacting and relating with others, the ALJ's conclusion was based in part on Ms. Sutrious' finding that M.R.E. had only slight problems - or none - in this domain, as well as M.R.E.'s testimony that he had friends at school. AR 42. The ALJ found that the claimant's asthma caused less than marked limitations in the domain of health and physical well-being; M.R.E. was compliant with his medication regimen and never visited the emergency room or was hospitalized due to this condition. AR 44. Moreover, the ALJ noted, M.R.E. testified that he was an active child who enjoyed playing sports, and his teacher noted no problems in this area of functioning. AR 44.

[48] The ALJ found that there was no evidence in the record that M.R.E. suffered from limitations with respect to the domain of moving about and manipulating objects, whereas the claimant testified that he enjoyed playing sports. AR 43. Likewise, the ALJ concluded, there was no evidence to support a finding that M.R.E. was in any way limited in the domain of self-care. AR 44.

that follow, finds merit in both contentions. As such, this case should be remanded for further

development of the record. See Rodriguez v. Astrue, 07-Civ-534 (WHP) (MHD) 2009 WL

637154, at *18 (S.D.N.Y. Mar. 9, 2009) (order adopting report and recommendation) ("Remand

is appropriate when the ALJ neglects to pursue information that would fill gaps in the record."

(citations omitted)).

### 1.    Development of M.R.E.'s Psychiatric and Academic Records

The claimant bears the burden of proving that he or she is disabled, and must therefore

provide evidence to support a claim for SSI disability. 20 C.F.R. § 416.912(a)(1). Due to the

non-adversarial nature of social security hearings, however, an ALJ also has the affirmative duty

to develop a "complete medical history for at least the 12 months preceding the month in which

[the claimant] file[d] [his or her] application." 20 C.F.R. § 416.912(b); see also Lamay v.

Comm'r of Soc. Sec., 562 F. 3d 503, 508-09 (2d Cir. 2009). This obligation is accentuated when

a claimant appears pro se, as the ALJ must "scrupulously and conscientiously probe into, inquire

of, and explore for all the relevant facts." Lamay, 562 F. 3d at 509 (quoting Hankerson v.

Harris, 636 F. 2d 893, 895 (2d Cir. 1980)). Additionally, courts in the Southern District of New

York have recognized that the ALJ's duty to develop the record is heightened where the claimant

alleges he or she suffers from a mental illness. Hidalgo v. Colvin, No. 12-Civ-9009 (LTS) (SN),

2014 WL 2884018, at *4 (S.D.N.Y. June 25, 2014); see also Gabrielsen v. Colvin, No. 12-Civ-

5694 (KMK) (PED), 2015 WL 459548, at *4-5 (S.D.N.Y. July 30, 2015) (collecting cases in

order adopting report and recommendation). The duty is also enhanced when, as in this case, the

claimant is a child. See, e.g., Price ex rel. A.N. v. Astrue, 42 F. Supp. 3d 423, 432 (E.D.N.Y.

2014) (citing Encarnacion ex rel. George v. Barnhart, No. 00-Civ-6597 (LTS) (THK), 2003 WL

1344903, at *2 (S.D.N.Y. Mar. 19, 2003)).  Nevertheless, where there are no obvious gaps, and

the record provides "a complete medical history," the ALJ is under no obligation to obtain

additional information before rejecting a claim.  Rosa v. Callahan, 168 F. 3d 72, 79 n.5 (2d Cir.

1999) (citing Perez v. Chater, 77 F. 3d 41, 48 (2d Cir. 1996)).

Here, the ALJ failed to fulfill his heightened duty to develop the record.  As an initial

matter, the ALJ's duty was elevated in this case because, at the time of his decision, he was

confronted with an (1) unrepresented (2) minor claimant (3) alleging mental impairments.  The

record, moreover, contained glaring gaps.  Regarding the relevant period between the application

date and the date of the ALJ's decision, an 18-month span, the record included only 14 pages[49] of

psychiatric notes and approximately 18 pages of academic documents.  AR 46-49.[50]  AR 422.

As the following discussion sets forth, this left obvious holes in the record, which the ALJ never

sought to develop despite his affirmative and heightened duty to do so.  See Rosa, 168 F. 3d at 79

("where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop

a claimant's medical history [.]").

---

[49] The psychiatric records included: August 6, 2012, treatment notes from Ms. McVey, the claimant's therapist at the Bellevue Program (AR 526);  Dr. Alcera's notes from an August 14, 2012, medication management session while M.R.E. was still at the Bellevue Program (AR 430, 527-29); Ms. McVey's treatment notes from August 16 and September 14, 2012 (AR 529-30); a comprehensive treatment plan completed by Astor Services staff members in October, 2012 (AR 404-06); three photocopies of Vyvanse prescriptions, dated from November, 2012, through November, 2013 (AR 407, 408, 540); a one-page letter from Ms. Hiller, M.R.E.'s treating psychotherapist at Astor Services, dated  April 3, 2013 (AR 422); and a one-page treatment plan completed by a nurse with Astor Services on November 6, 2013 (AR 539).

[50] The academic records included: two PS 35 report cards, one of which was completed at the end of third term of 2011 (AR 262), and the other following the spring term of 2012 (AR 260); and two teacher questionnaires, the first of which was completed by Ms. Berman, of PS 35, on August 8, 2012 (AR 248-57), and the second was prepared by Ms. Sutorius, M.R.E.'s teacher at PS 96, on October 21, 2012.  AR 410-17.

One such gap was the paucity of records from M.R.E.'s treating psychotherapists at Astor Services. At the time of the decision, the record included a letter dated April 3, 2013, from Ms. Atara Hiller of Astor Services. AR 422. Therein, Ms. Hiller wrote that she had provided M.R.E. weekly psychotherapy, and that Erica Silen, a nurse practitioner, had provided the claimant with monthly medication management since September 13, 2012. AR 422. Plaintiff also testified that M.R.E. was receiving ongoing treatment at Astor Services. AR 63. The record, however, was devoid of any treatment notes from these sessions; nor did it include an opinion regarding M.R.E.'s ability to perform in the six functional domains from any treating mental health professionl. Aside from Ms. Hiller's letter, the next most recent notes from Astor Services were dated in early October, 2012. AR 404. This left nearly six months of treatment records unaccounted for. See, e.g., Velez v. Comm'r of Soc. Sec., No. 14-Civ-3084 (CS)(JCM), 2017 WL 1831103, at *15 (S.D.N.Y. May 5, 2017) (order adopting report and recommendation) (six-month gap in mental health treatment notes constituted gap in the record). The ALJ, though, made no efforts to obtain these critical records, let alone request an opinion from Ms. Hiller or another mental health professional from Astor Services. This gap in the psychiatric records is also troubling because the ALJ based his disability determination, largely, on the opinions of two non-examining sources - Drs. Halperin and Altmansberg - who were also relying on an incomplete record, and therefore their opinions were entitled to less deference. AR 40-42. See Pratts v. Chater, 94 F. 3d 34, 38 (2d Cir. 1996) (opinion of a non-examining consultant or expert rendered without the benefit of a complete record cannot constitute substantial evidence).[51] The ALJ's failure to address this glaring gap in the record constituted legal error.

---

[51] Faced with this situation, it was well within the ALJ's discretion to direct M.R.E. to attend a consultative examination. See 20 C.F.R. § 416.920b(b)(2)(iii) ("If the evidence is

Additionally, the ALJ failed to assist Plaintiff in seeking evidence to resolve an apparent gap in M.R.E.'s academic records. SSA regulations "require adjudicators to try to get ... school records whenever they are needed to make a determination or decision regarding a child's disability." Social Security Ruling ("SSR") 09-2p(IV): Title XVI: Determining Childhood Disability - Documenting a Child's Impairment-Related Limitations, 74 Fed. Reg. 7525 (Feb. 18, 2009); see also 20 C.F.R. 416.924a(a)(2)(iii) ("If you go to school, we will ask for information from your teachers and other school personnel about how you are functioning on a day-to-day basis ...). Here, at the time the ALJ issued his January, 2014, decision, the most recent academic document was a teacher questionnaire prepared by Ms. Sutorious over one year earlier, in October, 2012. The ALJ made no attempt to secure additional school records, despite the fact that M.RE. had completed a full year of third grade, and was well into his fourth grade year at PS 96, by the time the decision was issued. Such records, whether in the form of a teacher questionnaire, report card, or IEP, were of particular relevance to M.R.E.'s claims. See Cespedes ex rel. Cespedes v. Barnhart, No. 00-Civ-8276 (GEL), 2002 WL 1359728, at *4 (S.D.N.Y. June 21, 2002) (noting that the SSA places importance "upon school records as a source of documentary evidence of mental disorders in children[.]"). The ALJ's failure to attempt to seek these files marks a breach of his heightened duty to develop the record.

Nevertheless, the Commissioner argues that, despite "the few records before the ALJ from the period at issue", the "SSA fully discharged its regulatory obligation" to develop the record, 2012. ECF No. 23, at 27-28. In developing a claimant's complete medical history, the

---

consistent but we have insufficient evidence to determine whether you are disabled, ... [w]e may ask you to undergo a consultative examination at our expense[.]"). His failure to do so indicates an area where further development of the record could have been made.

regulations require that the SSA make "every reasonable effort to obtain medical evidence from [a claimant's] medical sources." 20 C.F.R. § 416.912(d). "Every reasonable effort" means making an initial request for evidence from the medical source, followed by a subsequent request at any time between 10 to 20 calender days later. 20 C.F.R. § 416.912(d). If, after making such requests, "the documents received lack any necessary information, the ALJ should recontact the treating [sources]." Oliveras ex rel. Gonzalez v. Astrue, No. 07-Civ.-2841 (RMB)(JCF), 2008 WL 2262618, at *6 (S.D.N.Y. May 30, 2008), report and recommendation adopted, 2008 WL 2540816 (S.D.N.Y. Jun. 25, 2008). Importantly, these regulations prescribe "only minimal requirements. Where, as here, a doubly heightened duty applies [because claimant was pro se and alleging mental impairments], greater efforts are necessary." Corporan v. Comm'r of Soc. Sec., No. 12-Civ-6704 (JPO) (SN), 2015 WL 321832, at *6 n. 7 (S.D.N.Y. Jan. 23, 2015) (order adopting report and recommendation). In this case, the parties do not dispute that in August, 2012, the SSA made initial requests for documents from every treating source Plaintiff identified in her application, as well as from PS 96. ECF Nos. 23, at 28; 26, at 2; see also AR 283-87. These efforts, however, were insufficient to absolve the ALJ of his heightened responsibility to further develop the record. The requests were made over one year prior to the date of the decision. They were, furthermore, never followed by any subsequent requests. Such follow-up requests should have been made when, as here, the ALJ acknowledged the paucity of treating opinion evidence in his decision, only to leave this absence of evidence unaddressed before rejecting M.R.E.'s claim.[52] The Court therefore finds the Commissioner's argument, that the ALJ satisfied his duty to develop the record by way of the Agency's initial requests in August, 2012,

---

[52] Indeed, the ALJ noted that, but for the two non-examining sources, no medical professionals offered an opinion regarding M.R.E.'s performance in the six domains. AR 40-42.

unavailing. See Jones v. Apfel, 66 F. Supp. 2d 518, 523-24 (S.D.N.Y. 1999) (describing that, in the context of pro se claimants, 'reasonable efforts' "entails more than merely requesting reports from the treating physicians. It includes issuing and enforcing subpoenas requiring the production of evidence, as authorized by 42 U.S.C. § 405(d), and advising the plaintiff of the importance of the evidence.").[53]

## 2. **Full & Fair Hearing**

The full and fair hearing requirement is derived from the ALJ's affirmative duty to develop the record. Lamay, 562 F. 3d at 508-09; see also Estrada v. Comm'r of Soc. Sec., No.

_____

[53] The Commissioner's argument that the ALJ's duty to develop the record was confined to the 12-month period preceding the filing of M.R.E.'s application for SSI is also unsuccessful. The Court finds that the ALJ in this case had an affirmative duty to develop M.R.E.'s record up to the decision date. Although the regulations require the Commissioner to develop a claimant's complete medical history "for at least the 12 months preceding the month" in which the application is filed, 20 C.F.R. § 416.912(b), this represents the floor, not the ceiling, with respect to the ALJ's responsibility to develop the record; some courts within this circuit have "held that the ALJ is responsible for developing a full and complete record between the time that elapses between plaintiff's application and plaintiff's hearing date." Scott v. Astrue, No. 09-Civ-3999 (KAM), 2010 WL 2736879, at *14 n. 60 (E.D.N.Y. July 9, 2010) (citing Pettey v. Astrue, 582 F. Supp. 2d 434 (W.D.N.Y. 2008), and Lisa v. Sec'y of the Dep't of Health & Human Servs., 940 F. 2d 40, 44 (2d Cir. 1991)). "Whether the ALJ has a duty to develop the record with respect to treating sources after the date of filing is not settled and may depend on the facts of the case." Moreira v. Colvin, No. 13-Civ-4850 (JGK), 2014 WL 4634296, at *5 n. 2 (S.D.N.Y. Sept. 15, 2014) (emphasis in original). Such affirmative development is particularly appropriate in cases where a pro se claimant alleges mental impairments. Corporan, 2015 WL 321832, at *26 (citing Cruz v. Sullivan, 912 F. 2d 8, at 11 (2d Cir. 1990), and Camilo v. Comm'r of Soc. Sec., No. 11-Civ-1345 (DAB)(MHD), 2013 WL 5692435, at *22 (S.D.N.Y. Oct. 2, 2013) (order adopting report and recommendation)). Another important factor is whether the claimant is under ongoing treatment for the alleged disability at the time of the decision. Moreira, 2014 WL 4634296, at *5 n. 2. Here, M.R.E. was a pro se claimant, alleging mental impairments, and received treatment for those conditions through the decision date. Plaintiff informed the ALJ at the hearing that M.R.E. was then receiving care for his related symptoms at Astor Services, and attending special education classes. AR 63. These facts were confirmed by evidence, albeit incomplete, that was in the record before the ALJ. He should therefore have sought treatment notes and opinions from these centrally important sources whose records could "reasonably [be] expected to produce information necessary" for a complete decision. Corporan, 2015 WL 321832, at *27.

13-Civ-4278 (CM) (SN), 2014 WL 3819080, at *3 (S.D.N.Y. June 25, 2014) (adopting report and recommendation). "Before determining whether the Commissioner's conclusions are supported by substantial evidence, [the Court] must first be satisfied that the claimant has had a full hearing under the ... regulations and in accordance with the beneficent purposes of the [Social Security] Act." Moran v. Astrue, 569 F.3d 108, 113 (2d Cir. 2009) (internal quotations and citation omitted). When, as here, the claimant appears pro se, the ALJ must make a diligent effort to help the claimant further develop the record at the hearing. Id. Whether a claimant received a full and fair hearing depends on various factors, such as "whether the ALJ asked questions regarding the disposition and extent of the claimant's subjective symptoms, the number of witnesses, and the length of the transcript." Smith v. Colvin, No. 14-Civ-5868 (ADS), 2016 WL 5395841, at *14 (E.D.N.Y. Sept. 27, 2016) (quoting Almonte v. Apfel, No. 96-Civ-1119, 1998 U.S. Dist. LEXIS 4069, at *21-23 (S.D.N.Y. Mar. 31, 1998)). At core, an ALJ should "question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." Brown v. Comm'r of Soc. Sec., 709 F. Supp. 2d 248, 256 (S.D.N.Y. 2010).

The December, 2013, hearing in this case consumed 18 minutes, and generated a 16-page transcript. AR 52-68.[54] Plaintiff argues that this proceeding was brief, perfunctory, and fell short of providing M.R.E. a full and fair hearing. ECF Nos. 19, at 38-39; 26, at 5. Such brevity, "while not conclusive, is indicative of the ALJ's failure to conduct an investigation sufficient to

---

[54] In the foregoing analysis, the Court only addresses Plaintiff's claim with respect to the December, 2013, hearing. Although the ALJ conducted two hearings, he relied solely on the December proceeding in his decision. Likewise, the parties' arguments focus exclusively on the December hearing.

fulfill his [or her] duty to develop the record." Miranda v. Barnhart, No. 04-Civ-7257 (LAK) (JCF), 2006 WL 6174093, at *13 n. 15 (S.D.N.Y. Feb. 1, 2006) (order adopting report and recommendation). As such, the Second Circuit, and district courts within the Circuit, have looked to the length of both the proceeding and the transcript in determining whether the claimant was afforded a full and fair hearing. See Gallo v. Colvin, No. 15-Civ-9302 (AT) (BCM), 2016 WL 7744444, at *10 (S.D.N.Y. Dec. 23, 2016) (collecting Second Circuit cases demonstrating that 10, 11, 13, and 14-page transcripts may evidence unusually short hearings indicative of insufficient questioning by the ALJ). Here, the length of the December hearing, alone, whether measured by the time it took to complete (18 minutes) or the transcript it yielded (16 pages), is sufficient to raise concern that the ALJ failed to conduct an adequate inquiry. See ECF No. 19, at 39 (citing Robinson v. Sec'y of Health and Human Servs., 733 F. 2d 255, 257 (2d Cir. 1984) [30-minute hearing]; Hankerson, 636 F. 2d at 894 [16-page transcript]; Torres v. Comm'r of Soc. Sec., No. 13-Civ-730 (KBF), 2014 WL 406933, at * (S.D.N.Y. Feb. 3, 2014) [11-minute hearing]; Miranda, 2006 WL 6174093, at *13 [10-page transcript]).

A closer examination of the hearing transcript, moreover, shows that the ALJ's questioning of the medical expert was especially wanting. Dr. Halperin simply repeated M.R.E.'s diagnoses, and stated that the claimant was "responding moderately well" to Vyvanse, although the medication wore off in the afternoon. AR 65. The ALJ then prompted the expert with a series of questions as he walked Dr. Halperin through the three-step disability analysis. AR 66-67.[55] Dr. Halperin did not

---

[55] ALJ: Doctor, are you familiar with the domains of functionality that are published in the regulation to evaluate the functional limitations on children?
Expert: Yes
ALJ: What about domain one, acquiring and using information.... No limitation, less than marked, marked, or extreme?
Expert: Less than marked.

cite to any evidence in support of his findings. Moreover, not once did the ALJ ask the expert a substantive follow-up question or inquire into the bases of his opinions. Such a "consistent pattern of neglecting to follow up on pertinent topics of inquiry" with a medical expert represents a failure of the ALJ's heightened duty to develop the record in this case. Miranda, 2006 WL 6174093, at *13 (citing Cruz, 912 F. 2d at 12). As such, on remand, a new hearing should be conducted, wherein the ALJ summons a medical expert, elicits his or her opinions, and inquires into the bases of those findings.

### C. **Substantial Evidence**

The parties also dispute whether the ALJ's decision was supported by substantial evidence, both as written and in light of the newly submitted evidence. ECF Nos. 23, at 24-27; 26, at 6. Where, as here, an ALJ has "failed to develop the record, the reviewing court 'need not - indeed, cannot - reach the question of whether the Commissioner's denial of benefits was based on substantial evidence.' " Oliveras ex rel. Gonzalez, 2008 WL 22622618, at *8 (quoting Jones, 66 F. Supp. 2d at 542), report and recommendation adopted, 2008 WL 2540816 (S.D.N.Y. Jun. 25, 2008); see also Pratts, 94 F. 3d at 38 (incomplete record precluded finding that decision was supported by substantial evidence). Where "there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that the claimant will be deprived of the right to have

---

ALJ: And domain two, attending and completing tasks?
Expert: Less than marked.
ALJ: Domain three, interacting, relating with others?
Expert: That varies. It's from, again, less than marked.
The ALJ then continued with the same questioning through all six domains, before asking the expert whether he had anything to add, to which he responded that he did not, and the inquiry concluded. AR 66-67.

[his or] her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F. 2d 983, 986 (2d Cir. 1987). Here, as discussed above, the ALJ committed legal error in failing to develop the record. Accordingly, the Court cannot assess whether the ALJ's decision, as written, is supported by substantial evidence.

Likewise, the Court cannot conclude that the ALJ's decision was supported by substantial evidence in light of the records first submitted to the Appeals Council. See ECF Nos. 23, at 38-43; 26, at 7-10. When, as here, "the Appeals Council denies review of a case, the ALJ's decision, and not the Appeals Council's, is the final agency decision." Lesterhuis v. Colvin, 805 F. 3d 83, 87 (2d Cir. 2015) (citing Perez, 77 F. 3d at 44). The reviewing court must then evaluate that decision in light of the "entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support the decision of the [Commissioner]." Id.; see also Perez, 77 F. 3d at 45. Nevertheless, the Court may not "affirm an administrative action on grounds different from those considered by the agency." Burgess v. Astrue, 537 F. 3d 117, 128 (2d Cir. 2008) (quoting Melville, 198 F. 3d at 52). Here, Plaintiff submitted three tranches of post-hearing evidence to the Appeals Council. First, she augmented the record with evidence pertaining to the relevant period, between the application date, July 24, 2012, and the date of the ALJ's decision, January 15, 2014.[56] Next, she also added new evidence detailing M.R.E.'s treatment in the

---

[56] This evidence included: a final treatment plan completed by the staff at the Bellevue Program on August 7, 2012 (AR 567); an intake summary which the staff at Astor Services completed on August 27, 2012 (AR 553-61); Tisha John's initial assessment of M.R.E. upon his admission into Astor Services, also dated August 27, 2012 (AR 568); Dr. Desmond Heath's September 25, 2012, psychiatric assessment (AR 569-70); an updated 2012-2013 IEP completed by M.R.E.'s teachers at PS 96, dated November 26, 2012 (AR 345-57); June 10, 2013, staff notes from Astor Services (AR 575-78); and a September 10, 2013, treatment plan by Nurse Practitioner Silen of Astor Services (AR 579).

years prior to the application date.[57] Lastly, Plaintiff submitted evidence generated after the ALJ's decision.[58] As the Commissioner notes, this evidence includes findings that may support the ALJ's determination that M.R.E. was not disabled.[59] Nevertheless, as Plaintiff argues, other aspects of the newly submitted records contradict that determination, and could, reasonably, lead a fact finder to reach the opposite conclusion.[60] Ultimately, though, the weighing of this newly submitted evidence

---

[57] This evidence included: Dr. Vito's psychiatric evaluation of March 21, 2009 (AR 544-47); a November 2, 2009, letter from Plaintiff addressed to the DOE (AR 294); a letter from Dr. Vito and Ms. McEvoy, both of Steinway, to the DOE, dated January 12, 2010 (AR 548); Dr. Coll's psychological evaluation of January 13, 2010 (AR 340-44); an IEP for the 2011-2012 school year completed on April 1, 2011 (AR 296-305); Dr. Vito's report of April 6, 2011 (AR 549); a June 27, 2011, letter from Dr. Bonete and Ms. McEvoy ( AR 551); an IEP for the 2012-2013 school year, completed on April 17, 2012 (AR 306-16); and a July 5, 2012, treatment plan completed by Ms. McVey and Dr. Alcera of the Bellevue Program (AR 564-65).

[58] These records included: a March 19, 2014, teacher questionnaire completed by Ms. Sutorious (AR 331-39); an Astor Services treatment plan prepared on April 1, 2014 (AR 571-74); and Nurse Practitioner Silen's notes of April 9, 2014. AR 325.

[59] Some of this evidence is consistent with information already before the ALJ. For example, the newly submitted Bellevue Program notes dated July 5, 2012, indicate that M.R.E. was making improvements, compliant with his medication, but became less focused near the end of the school day and continued to act bossy with classmates. AR565, 567. These findings matched earlier notes from the Bellevue Program, and hearing testimony, which were before the ALJ. AR 55, 383, 440. Mental status examinations completed at Astor Services, and first submitted to the Appeals Council, generally lined up with Dr. Alcera's evaluations, which found M.R.E. was within normal limits. AR 435, 443, 509, 520-21, 558, 560. The newly submitted IEPs, from September and November, 2012, described M.R.E.'s improving behavior in school, describing him as a "gentleman" and respectful, which would support the ALJ's finding that M.R.E. had less than marked limitations in the domain of interacting and relating with others. Some of the newly submitted evidence was also cumulative of information already before the ALJ. Namely, a June 10, 2013, treatment plan by Astor Services describing M.R.E.'s anger management problems and difficulty focusing was substantively indistinguishable from a letter, dated April 3, 2013, from the same organization, which was included in the record before the ALJ. AR 422, 575-78.

[60] Some of this evidence appears to contradict the ALJ's findings with respect to the domains of attending and completing tasks, and interacting and relating with others. In each of these domains, the ALJ found that M.R.E. had less than marked limitations. The ALJ, however, did not consider any of the opinionative evidence first submitted to the Appeals Council. This evidence included the Astor Services intake summary, which described M.R.E.'s "disrespectful

must be made by the ALJ in the first instance rather than the Court. See Lesterhuis, 805 F. 3d at 88 ("On remand, the ALJ might conclude that [the treating source] opinion is not entitled to any weight, much less controlling weight, but that determination should be made by the agency in the first instance, and we should refrain from 'affirm[ing] an administrative action on grounds different from those considered by the agency.' ") (quoting Burgess, 536 F. 3d at 125 (quoting Melville, 198 F. 3d at 52)). Accordingly, the Court cannot conclude that the ALJ's decision, in light of the newly submitted records, is supported by substantial evidence.[61] On remand, the newly submitted records should be considered by the ALJ in evaluating M.R.E.'s claim.

---

[behavior] to [his] teachers," and his hyperactivity, which was "always a problem[.]" AR 553. The same report documents M.R.E.'s impulsivity, verbal and physical aggression, and poor attention span. AR 556. In March, 2014, Ms. Sutorious, after having known M.R.E. for two years, completed a second teacher questionnaire, wherein she noted that the claimant suffered from a number of "serious" and "obvious" problems in the domains of attending and completing tasks, and interacting and relating with others. AR 333-34. Additionally, a report completed in April, 2014, from M.R.E.'s treating sources at Astor Services indicated a worsening of M.R.E.'s behavioral problems. AR 572. These notes described M.R.E.'s classroom disruptions, prolonged tantrums, speaking without permission, and disrespect toward Plaintiff and his teachers. AR 572. Although some of these records were generated after the ALJ's decision date, that fact alone does not render them immaterial. See Pollard v. Halter, 377 F. 3d 183, 193 (2d Cir. 2004) (in a case involving a pro se minor, evidence generated after the hearing date was material because it "directly support[ed] many of [the plaintiff's] earlier contentions regarding [her son]'s condition."). Here, although dated after the ALJ decision, the March and April, 2014, evidence "sheds light on [MRE]'s condition[s] prior to the ALJ determination[,]" and, importantly, presents "a reasonable possibility that [it] would have influenced" the ALJ to decide the case differently. Santiago-Jiminez v. Comm'r of Soc. Sec., No. 15-Civ-3884 (GBD (JCF), 2016 WL 5942318, at *3 (S.D.N.Y. Oct. 13, 2016) (order adopting report and recommendation) (quoting Pollard, 377 F. 3d at 193). As such, it may be considered on remand.

[61] The parties also dispute whether the Appeals Council has an independent obligation to provide "good reasons" before declining to review an ALJ decision. ECF Nos. 19, 42-45; 23, 43-45; 26, 10-13. Here, however, as in Lesterhuis, the Court does not consider this alternative argument because it finds that the ALJ's decision is not supported by substantial evidence. See Lesterhuis, 805 F. 3d at 89.

## CONCLUSION

For the foregoing reasons, I conclude, and respectfully recommend that Your Honor should conclude, the Commissioner's motion for judgment on the pleadings (ECF No. 22) be denied, Plaintiff's motion (ECF No. 17) be granted, the ALJ's decision vacated, and the case be remanded to the Agency for further proceedings consistent with this Report and Recommendation.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation.  Such objections, if any, shall be filed with the Clerk of Court with extra copies delivered to the chambers of The Honorable Cathy Seibel at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Seibel.

Dated: June  / , 2017
White Plains, New York

**SO ORDERED**

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York